## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

BIGE MULLINS,                          :

     Plaintiff,                    :

                                          Case No. 3:13cv00226

vs.                                    :

                                          District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                     :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,               :

     Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

### I.    <u>Introduction</u>

The Social Security Administration has determined that Plaintiff Bige Mullins is

eligible for Disability Insurance Benefits and Supplemental Security Income because he was

under a disability beginning on November 9, 2006.  His disability began then because

peripheral vascular disease in his right lower leg had become markedly worse.  When this

problem combined with his already existing left-leg amputation (below his knee), he could

no longer walk or stand for sufficient periods of time to perform a significant paid job.  (Tr.

26-27).

This did not fully resolve Plaintiff's applications.  He also asserted that he had been

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

under a disability starting on July 25, 2002 due to a stroke and resulting health problems he suffered at that time. (Tr. 124). A Social Security Administrative Law Judge – Amelia G. Lombardo – concluded that Plaintiff was not under a disability and, thus, not eligible for benefits from July 25, 2006 to November 9, 2006.

Plaintiff contends that ALJ Lombardo's partial non-disability determination was based on her flawed evaluation of the medical source opinions of record. He also asserts that the record otherwise lacks substantial evidence supporting ALJ Lombardo's partial non-disability decision. He asks this Court to reverse the ALJ's decision and remand this matter to the Social Security Administration for payment of benefits due to the existence of his benefits-qualifying disability before November 9, 2006.

The Commissioner argues that ALJ Lombardo's decision should be affirmed as it is supported by substantial evidence.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), the administrative record, and the record as a whole.

This Court has jurisdiction to review ALJ Lombardo's decision. 42 U.S.C. §§ 405(g), 1383(c)(3).

## II.    **"Disability" Defined**

To be eligible for Disability Insurance Benefits or Supplemental Security Income a claimant must (among other requirements) be under a "disability" within the definition of

the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  "Disability" is defined

essentially the same for both types of benefits.  *See Bowen v. City of New York*, 476 U.S.

467, 469-70 (1986).  A "disability" consists only of physical or mental impairments that are

both "medically determinable" and severe enough to prevent the applicant from (1)

performing his or her past job and (2) engaging in "substantial gainful activity" that is

available in the regional or national economies.[2]  *See Bowen*, 476 U.S. at 469-70.

**III.**  **Background**

    **A.**  **Plaintiff and His Three Rounds of Administrative Proceedings**

When Plaintiff was an infant, a blood clot in his leg caused him to have a left-leg

amputation below his knee.  (Tr. 323).  He later developed serious health problems

including, in part, a stroke in 2002 caused by stenosis (narrowing) of his carotid arteries.

(Tr. 124).  He maintains, "As a result of the stroke, he has numerous emotional difficulties

and physical limitations."  *Id*.

Plaintiff graduated from high-school and worked for years mainly as a mason.  (Tr.

216, 179).

In October 2002, Plaintiff filed applications for Disability Insurance Benefits and

Supplemental Security Income.  Before reaching this Court, Plaintiff's applications went

through several rounds of administrative decisions.  These began in 2006 when ALJ Melvin

---

    [2] The impairment must also be one "which can be expected to result in death or which has lasted
or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423,
1382c(a)(3).

3

A. Padilla issued a decision (Tr. 47-65) finding that Plaintiff had the severe impairments of "carotid artery disease, residuals of bilateral endarterectomy procedures, residuals of an old prior cerebrovascular accident, a mild cognitive disorder, depression, and a history of substance abuse in alleged remission." (Tr. 54). ALJ Padilla further concluded that with certain limitations, Plaintiff could perform medium work or, in other words, he could lift up to 50 pounds at a time and could frequently lift or carry objects weighing up to 25 pounds. *See* Tr. 63; *see also* 20 C.F.R. §§ 404.1567(c), 416.967(c). This and other findings led ALJ Padilla to conclude that Plaintiff was not under a benefits-qualifying disability on or after July 25, 2002. (Tr. 63-65).

Next, the Social Security Administration's Appeals Council vacated ALJ Padilla's decision on the ground that the administrative record lacked sufficient evidence concerning Plaintiff's mental impairments and resulting limitations. Consequently, the Appeals Council remanded the matter for further administrative proceedings. (Tr. 67-69).

On remand, the matter was assigned to ALJ Lombardo. After gathering additional evidence, ALJ Lombardo issued a decision in October 2008. (Tr. 74-88). She ultimately found that Plaintiff was under a benefits-qualifying disability beginning on November 9, 2006. Beginning on that date, according to ALJ Lombardo, Plaintiff could perform only sedentary work due to "peripheral cardiac disease [that] had markedly worsened" combined with the substantial compromise in his mobility due to "progress ischemic changes" in his right leg and the amputation of his lower-left leg. (Tr. 85-86). But, ALJ Lombardo also

4

found that Plaintiff was not under a benefits-qualifying disability before November 9, 2006 mainly because he could perform medium work with specific limitations – again: work that involves lifting up to 50 pounds at a time with frequently lifting/carry up to 25 pounds.  (Tr. 81-85).

The matter again proceeded to the Appeals Council.  In October 2010, the Appeals Council recognized that ALJ Lombardo had not provided a rationale for her findings concerning Plaintiff's abilities "in the four functional areas used to determine the severity of mental impairments ...."  (Tr. 91).  Given this, and another shortcoming in ALJ Lombardo's decision, *id*., and because the record was incomplete, the Appeals Council remanded the matter.  The Appeals Council instructed the ALJ to further evaluate Plaintiff's mental impairments as required by the Regulations and provide "specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c)."  (Tr. 92).  The Appeals Council also instructed the ALJ to obtain evidence from a "medical expert [cardiologist] to clarify what work-related limitations the claimant would have had from the peripheral artery disease prior to November 9, 2006."  (Tr. 92).

On remand, ALJ Lombardo held a hearing and, in October 2011, issued a partial non-disability decision, which the Appeals Council later declined to review.  Believing that he was under a disability starting on July 25, 2002, Plaintiff filed the present case seeking to reverse ALJ Lombardo's partial non-disability determination in October 2011.

**B.     ALJ Lombardo's October 2011 Decision**

ALJ Lombardo's October 2011 decision evaluated Plaintiff's disability status under the five-step sequential evaluation procedure required by Social Security Regulations. *See* Tr. 13-29; *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4);[3] *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 543 (6th Cir. 2004).

At Steps one and two, ALJ Lombardo determined that (1) Plaintiff had not engaged in substantial gainful activity after July 25, 2002; (2) he had severe impairments – specifically, " residuals of carotid artery disease and a cerebral vascular accident with associated bilateral endarterectomies, peripheral vascular disease, residuals of the remote prior amputation of his left leg and corresponding use of a prosthesis, and cognitive disorder NOS, alcohol abuse and depression." (Tr. 16). At Step three, ALJ Lombardo found no Listing-level impairment that would have qualified Plaintiff for benefits. (Tr. 17-21; *see* Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1).

Reaching Step four of the sequential evaluation, ALJ Lombardo assessed Plaintiff's ability to perform work-related tasks despite his impairments – his Residual Functional Capacity. *See* 20 C.F.R. §§ 404.1520(a)(iv), 404.1545. She determined that before November 9, 2006, Plaintiff had the Residual Functional Capacity to perform a limited range of medium work with the following exceptions:

---

[3] The remaining citations are to the Disability Insurance Benefits Regulations. The citations incorporate the corresponding Supplemental Security Income Regulations without separately identifying them.

> [H]e was precluded from working at unprotected heights, climbing ladders or scaffolds, and from operating hazardous machinery.  [He] was also limited to performing low-stress, unskilled, simple, repetitive tasks which did not require extended periods of concentration, direct interpersonal contact with members of the general public, fast-paced work, [or] production quotas.

(Tr. 21).  ALJ Lombardo then found that before November 9, 2006, Plaintiff could not perform his past relevant work.  (Tr. 27).  And the ALJ recognized that Plaintiff's age placed him in the category of an individual closely approaching advanced age (50-54 years old), *id*.; *see* 20 C.F.R. §404.1563(d).

At Step five of the sequential evaluation, ALJ Lombardo found that given Plaintiff's Residual Functional Capacity, his age, and other pertinent factors, thousands of jobs existed before November 9, 2006 that he could have performed.  (Tr. 27-28).  This led, in the end, to ALJ Lombardo's conclusion that Plaintiff was not under a benefits-qualifying disability before November 9, 2006.  (Tr. 29).

## IV. <u>Judicial Review</u>

The Social Security Administration's determination of disability – frequently embodied in an ALJ's written decision – is subject to review in this Court along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).  Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of*

*Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## V.    Discussion

### A.    Medical Source Opinions

The parties' contentions initially center on the ALJ's evaluation of the medical source opinions concerning Plaintiff's mental residual functional capacity before November 9, 2006. The opinions were provided by one consulting psychologist, Dr. Flexman; two examining psychologists, Drs. Jones and Halmi; and an examining neurosurgeon, Dr. Smith. The record does not contain an opinion from a treating mental-health source.

"As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a

'nonexamining source'), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source') ...." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (internal citations omitted).  "In other words, '[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Id*., (quoting, in part, Social Sec. Ruling No. 96–6p, 1996 WL 374180 at *2 (eff. July 2, 1996)).

When weighing an opinion provided by a non-treating physician or psychologist, the ALJ must consider whether or not the opinion was based on an examination of the claimant and must consider a number of other factors set forth in the Commissioner's Regulations – specifically, specialization, consistency, supportability, and other factors "which tend to support or contradict the opinion."  20 C.F.R. § 404.1527(d)(2)-(6); *see Gayheart*, 710 F.3d at 376.  The Regulations appear to emphasize this requirement by reiterating it no less than three times.  *See* 20 C.F.R. § 404.1527(d); *see also* 20 C.F.R. § 404.1527(f)(ii); 20 C.F.R. § 404.1527(f)(iii); Social Sec. Ruling 96-6p, 1996 WL 374180 at *2.

### B.    The ALJ's Assessment of Plaintiff's Mental Residual Functional Capacity

The focal point here is on ALJ Lombardo's decision that Plaintiff's mental work abilities were limited to "low-stress, unskilled, simple, repetitive tasks which did not require extended periods of concentration, direct interpersonal contact with members of the general

public, fast-paced work, [or] production quotas."  (Tr. 21).

ALJ Lombardo based these findings on a "narrative" report that consulting psychologist Dr. Flexman sent to neurologist Dr. Wamsley on November 10, 2004.  (Tr. 23, 440-43).  Dr. Flexman's narrative report, in the ALJ's view, "references only moderate level restrictions."  (Tr. 23).

The ALJ declined to give significant weight to Dr. Flexman's responses in a supplemental questionnaire on November 23, 2010.  (Tr. 23-24, 444-47).  The ALJ also declined to credit the opinions of one-time examining psychologists Dr. Jones and Dr. Halmi, and one-time examining neurosurgeon Dr. Smith.  (Tr. 24-25; 453-62; 508-14; 515-24).

## 1.
## Consulting Psychologist Dr. Flexman

Dr. Flexman performed a consultative examination in the Fall of 2004, involving an interview of Plaintiff, cognitive and affective testing, and an evaluation.  (Tr. 440-43).  In his November 10, 2004 "narrative" report to Plaintiff's neurologist Dr. Wamsley, Dr. Flexman opined:

> The results of the current evaluation on Mr. Mullins reveal him to be a gentleman who appears to be experiencing some moderate cognitive impairment.  We especially note difficulties with abstract reasoning, visual-spatial organization, and his ability to shift cognitive sets.  Visual reaction time and attention to tasks would suggest difficulties that may cause him to be at risk for driving a motor vehicle.

(Tr. 442).

10

The ALJ observed that Dr. Flexman's narrative report "references at most only moderate level restrictions." (Tr. 23). She then explained:

> Dr. Flexman indicated that the claimant's scores on objective testing "fell within the mild range of impairment, showing minor difficulties in his ability to shift cognitive sets from one thought to another." Working memory was only "slightly impaired" and the projective drawing test showed evidence of just "mild" depression. Dr. Flexman's overall conclusion that the claimant was experiencing a "moderate" cognitive impairment is more in line with these findings.

(Tr. 23 (quoting, in part, Dr. Flexman, Tr. 441-42)).

In contrast, the ALJ did not credit the opinions Dr. Flexman expressed in the supplemental questionnaire on November 23, 2002. (Tr. 444-47). Dr. Flexman opined that Plaintiff was severely limited in his ability to perform work (40 hours per week) that involved frequent contact with others; performance of complex tasks; independent performance of routine repetitive tasks; performance of varied tasks; achieving goals and responding to time limits; and exercising acceptable judgment, tolerating stress, and maintaining production standards. (Tr. 445-46). Dr. Flexman also believed that Plaintiff had "moderately-severe" limitations in many others areas of mental-work abilities. *Id*.

The ALJ explained her rejection of these opinions:

> The mental capacity assessment form [supplemental questionnaire] submitted by Dr. Flexman was for the sole purpose of assisting the claimant in obtaining benefits. Upon consideration of these circumstances, it is appropriate to give greater weight to the narrative assessment Dr. Flexman wrote to Dr. Wamsley. This assessment was prepared for the purpose of providing treatment and again represents a more accurate description of the claimant's level of psychological functioning.

11

(Tr. 23) (internal citation omitted).

   The ALJ erred by rejecting Dr. Flexman's opinions about Plaintiff's mental-work abilities merely because the opinions appear in his responses to the supplemental questionnaire submitted to him by his counsel.  The ALJ did not point to any evidence in the record tending to show that Dr. Flexman's opinions were unduly influenced by the fact that Plaintiff's counsel sent the supplemental questionnaire to him.  Dr. Flexman's opinions instead tend to show that he grounded his opinions on Plaintiff's cognitive disorder and poor prognosis.  Dr. Flexman further noted that Plaintiff's "age & educational background would indicate minimal gains with therapy."  (Tr. 446).

   The regulatory factors applicable to the ALJ's evaluation of Dr. Flexman's opinions, 20 C.F.R. §§ 404.1527(3)-(6), do not specifically permit the ALJ to discount or reject a medical source's opinions solely because Plaintiff's counsel asked for them.  This is administratively wise.  If the Regulations permitted ALJs to reject medical-source opinions based solely on who asked – or paid – for them (a plaintiff or the Commissioner), the Regulations would frequently deprive the Commissioner of the assistance provided by state-agency medical sources and other program physicians and psychiatrists.  This would not sit well with the Social Security Administration because it considers these medical sources to be "highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims ...."  Social Sec. Ruling 96-6P, 1996 WL 374180 at *2 (July 2, 1996).  Although a medical source's understanding of Social Security Regulations is

12

a proper factor to consider, *see* 20 C.F.R. § 404.1527(d)(6), the Regulations stop short of requiring or allowing ALJs to either discount or credit a medical source's opinions based on which party asked for the opinions.  Instead, the Regulations carefully delineate other factors pertinent to the ALJ's evaluation, reiterating three times the requirement that those factors apply to the evaluation of non-treating medical sources.  *See* 20 C.F.R. § 404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion ...");  *see* also 20 C.F.R. § 404.1527(f)(ii) (factors apply to opinions of state agency consultants or other program physicians); 20 C.F.R. § 404.1527(f)(iii) (same as to medical experts' opinions); Social Sec. Ruling 96-6p, 1996 WL 374180 at *2 (same).

The Commissioner maintains that the ALJ properly rejected Dr. Flexman's opinions in the supplemental questionnaire as inconsistent with the narrative report he prepared for the purpose of treating Plaintiff.  Although "consistency" is a factor to consider under the Regulations, *see* 20 C.F.R. §404.1527(d)(3), the ALJ ignored or overlooked that Dr. Flexman's narrative report did not assess Plaintiff's vocational abilities.  The narrative report instead described Plaintiff's mental health from a medical/psychological standpoint, without exploring what work abilities or limits he had due to mental-health issues and without connecting the phrase "'moderate' cognitive impairment" in terms of Plaintiff's particular vocational abilities or limits.  *See* Tr. 440-43.

In contrast, the supplemental questionnaire presented Dr. Flexman with the option to choose from a list of specifically defined terms to assess Plaintiff's mental-work abilities.

The questionnaire defined "moderate" to mean, "An impairment of slight importance which does not affect ability to function"; "moderately-severe" meaning [a]n impairment which significantly limits mental capacity to perform basic work related functions"; or "severe" meaning "[e]xtreme impairment of ability to function."  (Tr. 444).  When presented with these definitions, Dr. Flexman's choices of "severe" or "moderately severe" rather than "moderate" when assessing Plaintiff's vocational abilities were not inconsistent with the limitations he identified in his narrative report.  For instance, Dr. Flexman stated in his narrative report:

> The results of the Continuous Performance Test were quite poor, showing marked difficulties with sustained attention to tasks.  Reaction time was quite slow.  He made multiple errors in terms of impulse control issues.  On the visual reaction time tasks, we note a number of errors.  In combination, these two tests would suggest that Mr. Mullins' ability to drive should be significantly restricted based on his visual-processing ability.

(Tr. 442).  Dr. Flexman did find that Plaintiff had "minor difficulties in his ability to shift cognitive sets from one thought to another."  *Id*.  But he also reported that Plaintiff had "difficulty learning new information across a series of tasks," and "his ability to recall the designs was quite poor [on the Bender-Berea Visual-Motor Gestalt Test]."  *Id*.  Such information tends to be consistent with Dr. Flexman's assessment of Plaintiff's mental work limitations as "moderately severe" or "severe."  Given such consistency, the ALJ erred by crediting some of Dr. Flexman's opinions (i.e., "'moderate' cognitive impairments) without considering or addressing information in the narrative report that was consistent with Dr. Flexman's later-expressed opinions about Plaintiff's specific vocational limits.  *Cf. Loza v.*

14

*Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *cf. also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002). This also denotes a lack of substantial evidence supporting the ALJ's evaluation of Dr. Flexman's opinions. "[S]ubstantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Social Sec.*, 531 Fed. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984)).

The ALJ, moreover, committed this same error – only on a broader canvas – by not recognizing that Dr. Flexman's opinions were consistent with those provided by other examining medical specialists – Drs. Jones, Halmi, and Smith. This may not have been error if the ALJ properly and reasonably evaluated – i.e., applied the correct legal criteria resulting in findings supported by substantial evidence – these three medical sources' opinions. The analysis thus turns to the ALJ's review of these opinions, beginning with Dr. Jones.

## 2.
## Examining Psychologist Dr. Jones

In May 2005, Psychologist Dr. Jones examined and evaluated Plaintiff for the Ohio Bureau of Disability Determinations. (Tr. 453-62). She diagnosed Plaintiff with Cognitive

Disorder NOS (not otherwise specified) and Depressive Disorder NOS.  (Tr. 458).  She

assessed his GAF at 50,[4] *id.*, indicating a person with indicating "serious symptoms ... or any

serious impairment in social, occupational, or school functioning (e.g., no friends, unable to

keep a job) ...."  <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text

Revision (DSM-IV-TR) at p. 34.  Dr. Jones further found that Plaintiff was "markedly

impaired" in his ability to perform mental work activities such as relating to coworkers and

supervisors; understanding, remembering, and following instructions; and withstanding

stress and pressures associated with daily work activity.  (Tr. 458-59).  In July 2005, Dr.

Jones circled answers on a form indicating her opinion that Plaintiff had "poor" or "no

useful ability to function" in these and others areas.  (Tr. 461-62).  And Dr. Jones opined

that Plaintiff had only "fair" ability in many additional areas, for example, his ability to

sustain ordinary work routine without supervision, make simple work-related decisions, or

ask simple questions or request assistance.  *Id.*

 The ALJ rejected Dr. Jones's opinions.  She observed that Dr. Jones described

"extreme restrictions" that were inconsistent with her (Dr. Jones's) own estimate of

Plaintiff's GAF because a GAF of 50 "is indicative of only moderate level psychological

---

  [4]  At the time of the ALJ's decision, health care professionals used the "GAF" (Global
Assessment of Functioning) scale to assess a person's psychological, social, and occupational
functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's
"overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*,
61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); <u>Diagnostic and Statistical Manual of Mental Disorders, 4th
ed., Text Revision</u> at 32-34.  The most recent version of the <u>Diagnostic and Statistical Manual of Mental
Disorders</u>, 5th ed., does not include the GAF scale.

symptoms ...." (Tr. 24). This is incorrect. A GAF of 50 indicates "serious symptoms ... or any serious impairment in social, occupational, or school functioning ...." DSM-IV-TR, at p. 34. Such serious symptoms or impairments are not inconsistent with Dr. Jones's opinions concerning Plaintiff's mental-work limitations.

The ALJ also rejected Dr. Jones's conclusion that Plaintiff had "extremely poor memory and cognitive skills." (Tr. 24). The ALJ found this conclusion unsupported by Dr. Jones's own findings and were based on "her subjective impressions during her short interview" rather than memory or other test results. *Id*. But, Dr. Jones's findings were supported by her assessment of Plaintiff's GAF at 50 and by her clinical observations that were within her area of expertise to make. Dr. Jones, for example, observed that Plaintiff "presented with a blunted affect and maintained little eye contact. Confusion, aphasia,[5] and rambling speech were noted." (Tr. 457 (footnote added). These are precisely the types of "signs and symptoms" or "psychological abnormalities which can be observed...," 20 C.F.R. § 404.152(a)-(b), that the Regulations recognize as evidence of a mental impairment or disability. In the same vein, the ALJ erred by downgrading Dr. Jones's clinical observations of Plaintiff's psychological signs and symptoms to valueless "subjective impressions." As the Sixth Circuit has explained:

> "[A] psychiatric impairment is not as readily amenable to substantiation
> by objective laboratory testing as a medical impairment ... consequently, the

---

[5] Generally, "aphasia" refers to the "[a]bsence or impairment of the ability to communicate through speech, writing, or signs because of brain dysfunction...." Taber's Cyclopedic Medical Dictionary at p. 141 (19th Ed. 2001); *see also* The Merck Manual at pp. 1380-82 (17th Ed. 1999).

diagnostic techniques employed in the field of psychiatry may be somewhat
less tangible than those in the field of medicine.... In general, mental disorders
cannot be ascertained and verified as are most physical illnesses, for the mind
cannot be probed by mechanical devices [*sic*] in order to obtain objective
clinical manifestations of medical illness....  [W]hen mental illness is the basis
of a disability claim, clinical and laboratory data may consist of the diagnosis
and observations of professionals trained in the field of psychopathology.  The
report of a psychiatrist should not be rejected simply because of the relative
imprecision of the psychiatric methodology or the absence of substantial
documentation, unless there are other reasons to question the diagnostic
techniques."

*Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (citations omitted).

In addition, as with Dr. Flexman, the ALJ ignored or overlooked significant

information in Dr. Jones's report that supported her opinions.  For example, Dr. Jones

administered the MMPI-2 "to assess general personality adjustment.  The resulting profile

proved valid."  (Tr. 456).  Dr. Jones recognized, "Serious problems are being admitted,

while mainly problems ... are being denied."  *Id*.  Dr. Jones observed that Plaintiff was

presenting himself "in many ways in an improbably favorable light."  *Id*.  Plaintiff's MMPI-

2 results also describe someone for whom "[e]xcessive use of defense mechanisms is

typical.  The primary defenses are repression and denial.  Projection and rationalization can

be present.  When difficulties are acknowledged, blame is often placed on others....  Feelings

of insecurity are likely.  Insight is probably minimal."  (Tr. 456).  Dr. Jones further noted,

"The likelihood is in favor of: poor judgment, confused thoughts, difficulty thinking

logically, [and] strange beliefs ...."  (Tr. 456-57).  Although these test results generally

describe the traits a person with Plaintiff's MMPI-2 might have, they did play a role in Dr.

18

Jones's analysis and are supportive of her opinions about Plaintiff's mental health and work abilities.

Accordingly, Plaintiff's challenges to the ALJ's evaluation of Dr. Jones's opinions are well taken.

### 3.
### Additional Review

Because the ALJ rejected Dr. Flexman's and Dr. Jones's opinions about Plaintiff's mental work abilities, she failed to recognize that these medical-source opinions were largely consistent with, and supportive of, each other.  Indeed, the record does not contain a medical-source opinion contrary to those provided by Drs. Flexman and Jones.  Their opinions, moreover, were consistent with other evidence.  In November 2002, treating neurologist Dr. Valle observed that Plaintiff had a "very flat affect" and lacked insight.  (Tr. 420).  In July 2004, treating neurologist Dr. Wamsley reported that Plaintiff had mistakenly stated he had a stroke eight months ago, when it was two years ago.  Dr. Wamsley thought Plaintiff's memory problems could be due to his stroke or early dementia.  In August 2004 Dr. Wamsley reported that Plaintiff was an "extremely poor historian," and in September 2004, Dr. Wamsley had a "difficult time understanding and communicating" with Plaintiff. (Tr. 433-36).

In October 2004, a speech therapist noted that Plaintiff had expressive aphasia, as well as "obvious" and "severe" memory problems.  (Tr. 452).  In an October 2002 interview, a State agency disability worker reported that Plaintiff appeared to think slowly

and not understand all of the questions. (Tr. 227). In February 2003, a State agency interviewer observed that Plaintiff walked slowly, hesitated before dating forms, often asked for a reminder of the date, and stopped to "think a few minutes" before answering questions. (Tr. 251-52).

It should be noted that the two remaining mental-health evaluators, Drs. Halmi and Smith, provided opinions about Plaintiff's mental-work abilities that were similar to Drs. Flexman and Jones. Although the ALJ rejected their opinions and Plaintiff challenges the ALJ's rejection, there is no need to address Plaintiff's challenges because of the above-discussed errors and the absence of a medical-source opinion contrary to those provided by Drs. Flexman and Jones.

For all the above reasons, Plaintiff's challenges to the ALJ's review of the opinions provided by Dr. Flexman and Dr. Jones are well taken.[6]

## VI.    Remand is Warranted

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for further proceedings or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of

---

[6] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenges to the ALJ decision.

law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A reversal of the ALJ's decision and a judicial award of benefits is warranted in the present case due to the errors identified previously and because the evidence of Plaintiff's mental disability beginning on July 25, 2002, on or near the date of his stroke, is either overwhelming or strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. The strong evidence includes the consistent opinions about Plaintiff's mental-work abilities and limitations provided by his consulting psychologist Dr. Flexman and examining psychologist Dr. Jones. In addition, assuming the ALJ properly discounted the opinions of Dr. Halmi, the ALJ still placed some weight – albeit "only minimal weight" – on his opinions. (Tr. 24). Placing "only minimal weight" on Dr. Halmi's opinion is not tantamount to wholesale rejection of his opinions. Because of this, Dr. Halmi's opinions constitute some evidence – albeit with minimal weight – that is consistent with the opinions provided by Drs. Flexman and Jones. As to potential contrary evidence, the record lacks a treating medical-source opinion contrary to the opinions provided by Drs. Flexman, Jones, and Smith. (Neurosurgeon Dr. Smith's opinions, although rejected by the ALJ, were not contrary to those of Drs. Flexman, Jones, and Smith.)

Lastly, ALJ Lombardo based her Step-three conclusion – i.e., that Plaintiff's mental impairments did not satisfy Listing 12.04A ("Organic Mental Disorders") – on the testimony of Dr. Buban at the October 25, 2005 administrative hearing. (Tr. 19). The ALJ explained, "after

21

a thorough review of the psychological evidence, [Dr. Buban] concluded that the claimant experienced no more than a moderate impairment in any functional area. She also noted the possibility of malingering and no more than mild-to-moderate cognitive impairment and depressive symptoms." *Id*.

Several problems arise here. First, the transcript of the October 25, 2005 hearing is not in the administrative record, apparently because it could not be located, as the Appeals Council reported. (Tr. 91). Without a transcript of Dr. Buban's testimony, there is no way to determine if ALJ Lombardo's reliance on it was supported by substantial evidence. This leads to the second problem in the ALJ's decision: It appears that the ALJ's description of Dr. Buban's testimony may have been partially inaccurate on the issue of Plaintiff's "mild-to-moderate cognitive ability." (Tr. 19). The possible inaccuracy arises due to the Appeals Council's report about Dr. Buban's testimony. The Appeals Council noted:

> Dr. Buban indicated that there were no records from which to determine the claimant's premorbid level of cognitive functioning or to provide a clear picture of the claimant's specific limitations. Consequently, Dr. Buban stated that, based on the deficiencies in the current record, she could not offer opinions [about] whether the claimant's cognitive disorder either met or equaled a listing.

(Tr. 19). If there were no records to provide a clear picture of Plaintiff's functioning, what substantial evidence supported ALJ Lombardo's acceptance of Dr. Buban's opinions or, for that matter, the ALJ's conclusion that Plaintiff had no more than mild-to-moderate cognitive functioning? (Tr. 19).

Perhaps most significantly, ALJ Lombardo did not evaluate Dr. Buban's testimony

22

under any of the factors required by the Regulations. In fact, it was impossible for her to do so given that the administrative record does not contain the transcript of Dr. Buban's testimony. Nonetheless, this means that ALJ Lombardo did not apply the correct legal criteria to Dr. Buban's opinion about Plaintiff's "mild-to-moderate functioning." *See* 20 C.F.R. § 404.1527(d)(2)-(6); *see also Gayheart*, 710 F.3d at 376.

In sum, the overwhelming evidence, or strong evidence while contrary evidence is weak, establishes that Plaintiff's mental impairments meet or equal the criteria of Listing 12.04A and B. This is due to the particular limitations established by Dr. Flexman's opinions in response to the supplemental questionnaire, by Dr. Jones's opinions, and because Dr. Halmi's opinions are due some, albeit "minimal," weight. Plaintiff is therefore entitled to benefits before November 9, 2006 based on the disability onset date of July 25, 2002.

Accordingly, an Order remanding this case for benefits is warranted. *See Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994).

### IT THEREFORE IS RECOMMENDED THAT:

1. The Commissioner's final non-disability decision be reversed;

2. Plaintiff Bige Mullins' applications for benefits, filed on October 4, 2002, be REMANDED to the Social Security Administration for payment of Disability Insurance Benefits and Supplemental Security Income consistent with the Social Security Act and based on the disability onset date of July 25, 2002;

3. The case be terminated on the docket of this Court.

April 8, 2014            s/Sharon L. Ovington
                                           Sharon L. Ovington
                               Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).